UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S DISTRICT COURT E.D N.Y

★   FEB 2 5 2010   ★

LONG ISLAND OFFICE

———————————————————————— x

WATERFORD TOWNSHIP POLICE & FIRE :
RETIREMENT SYSTEM, Individually and On :
Behalf Of All Others Similarly Situated,

            Plaintiff,

    vs.

SMITHTOWN BANCORP, INC., BRADLEY
E. ROCK, and ANITA M. FLOREK,

           Defendants.

———————————————————————— x

Civil Action No.

CLASS ACTION COMPLAINT

**CV 1o 0864**

**TOWNES, J.**

**REYES, JR, M.**

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Smithtown Bancorp, Inc. ("SBI" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of purchasers of the common stock of SBI between March 13, 2008 and February 1, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

3.     This Court has jurisdiction of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §§1331 and 1337.

4.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District.

5.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ National Market ("NASDAQ"), a national securities exchange.

## PARTIES

6.    Plaintiff Waterford Township Police & Fire Retirement System, as set forth in the accompanying certification which is attached hereto and incorporated herein by reference, purchased the common stock of SBI at artificially inflated prices during the Class Period and has been damaged thereby.

7.    Defendant SBI is a bank holding company with one direct wholly-owned subsidiary, Bank of Smithtown, a New York State chartered commercial bank. SBI also has three direct wholly-owned subsidiaries that formed for the purpose of issuing trust preferred securities, Smithtown Bancorp Capital Trust I, Smithtown Bancorp Capital Trust II and Smithtown Bancorp Capital Trust III. The Company maintains its headquarters in Hauppauge, New York.

8.    Defendant Bradley E. Rock ("Rock") is, and was at all relevant times, SBI's Board Chairman, President and Chief Executive Officer of SBI.

9.    Anita M. Florek ("Florek") is, and was at all relevant times, Executive Vice President and Chief Financial Officer of SBI. On November 19, 2009, Defendant Florek was also named Executive Vice President of the Bank and the Chief Accounting Officer of SBI and the Bank.

10.    Defendants Rock and Florek are collectively referred to herein as the "Individual Defendants."

11.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of SBI, were privy to confidential and proprietary information concerning SBI, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning SBI, as discussed in detail below. Because of their positions with SBI, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate

- 2 -

officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.   In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of SBI's business.

13.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

14.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to SBI's financial condition and performance, growth, operations, financial statements,

- 3 -

business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of SBI common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct, which operated as a fraud or deceit on purchasers of SBI common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding SBI's business, operations and management and the intrinsic value of SBI securities; (ii) enabled SBI to sell securities to unsuspecting investors at artificially inflated prices; and (iii) caused Plaintiff and other members of the Class to purchase SBI common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of SBI between March 13, 2008 and February 1, 2010, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SBI common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by SBI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of SBI;

(c)     whether the price of SBI common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**SUBSTANTIVE ALLEGATIONS**

22.     Defendant SBI, through its subsidiaries engages in a full range of commercial and consumer banking services. SBI also provides trust services, including demand, savings and time deposits accepted from consumers, businesses and municipalities located primarily within Long Island, NY.

23.     During the Class Period, SBI's primary source of revenue was interest income it received on its loan portfolio.

24.     The Class Period begins on March 13, 2008. On that date, SBI filed with the SEC its Form 10-K, signed by the Individual Defendants, for the year ended December 31, 2007, which included the following representations about the Company's disclosure and internal controls and the Individual Defendants certifications thereon:

Disclosure Controls and Procedures

An evaluation was performed under the supervision and with the participation of the Company's management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) promulgated under the Securities and Exchange Act of 1934, as amended) as of December 31, 2007. *Based on that evaluation, the Company's management, including the Chief Executive Officer and Chief Financial Officer, concluded that the Company's disclosure controls and procedures were effective.*

Report by Management On Internal Control Over Financial Reporting

Management of Smithtown Bancorp, Inc. is responsible for establishing and maintaining an effective system of internal control over financial reporting. The Company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. There are inherent limitations in the effectiveness of any system of internal control over financial reporting, including the possibility of human error and circumvention or overriding of controls. Accordingly,

- 6 -

even an effective system of internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation.

\*   \*   \*

Management assessed the Company's system of internal control over financial reporting as of December 31, 2007. This assessment was based on criteria for effective internal control over financial reporting described in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. *Based on this assessment, management believes that, as of December 31, 2007, the Company maintained effective internal control over financial reporting based on those criteria.*

\*   \*   \*

*There has been no change in the Company's internal control over financial reporting during the quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.*[1]

\*   \*   \*

I, [Defendants Rock and Florek], certify that:

1.      I have reviewed this report on Form 10-K of Smithtown Bancorp;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.      The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

a.      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its

---

[1]      Unless otherwise noted, all emphasis is added.

-7-

consolidated subsidiary, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.      evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions   about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      disclosed in this report any change in the   Registrant's internal controls over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal controls over financial reporting.

5.      The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the Registrant's auditors and the audit committee of Registrant's Board of Directors (or persons performing the equivalent function):

a.      all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b.      any fraud, whether or not material, that involves management or other employees who have a  significant role in the Registrant's internal controls over financial reporting. [Emphasis added.]

25.      These representations about the Company's disclosure and internal controls, and the

Individual Defendants certifications thereon, were repeated in all material respects in Forms 10-K

and 10-Q that SBI filed with the SEC throughout the Class Period.

26.      On April 24, 2008, SBI issued a press release announcing its earnings for the quarter

ended March 31, 2008, which stated, in pertinent part:

Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced that the Company had earnings for the first quarter of 2008 of $3,573,886, or $.37 per share.  These figures represent a 6% increase in net income

- 8 -

and a 6% increase in basic earnings per share. Basic earnings per share for the last twelve months now stand at $1.49.

*     *     *

***Asset quality remained strong. Nonperforming loans were .14% of total loans at the end of the quarter.*** The small increase of 7 basis points in nonperformers from $687,000 at December 31st to $1.6 million at March 31st is attributable to one relationship where the borrower has died and the loans are well-secured by multiple properties. The Bank does not hold any sub-prime loans, "Alt-A" loans, option ARMs, 2/28 ARMs or loans with teaser rates.

Defendant Rock commented on the results, stating in pertinent part as follows:

It has become clear that the current economic environment is creating opportunities for us. Many of our competitors have had to curtail lending due to capital constraints or liquidity constraints caused by sub-prime mortgage problems and other difficulties. As a result, we have greatly increased opportunities for permanent commercial mortgage lending. Most of these loans are on fully-tenanted commercial and multi-family buildings with seasoned cash flows. Because of recent Fed rate cuts and *the high quality of these loans*, the rates on these loans are somewhat lower than what we are accustomed to, but the volume of these loans available to us is unprecedented for our Company. Last year, loans grew by $135 million. For the first quarter of this year, loans grew by $140 million. We expect these increased lending opportunities to continue for the near future, which should allow us to build a significantly increased revenue stream. [Emphasis added.]

27.    In response to Defendants' positive statements, the price of SBI common stock rose

4.1%, to close at $19.43 per share.

28.    On May 8, 2008, SBI filed with the SEC its Form 10-Q for the quarter ended March

31, 2008 (the "2008 Q1 Form 10-Q"), which was signed by the Individual Defendants. The 2008 Q1

Form 10-Q included SBI's financial statements for the quarter ended March 31, 2008, which were

represented to have been presented in conformity with U.S. GAAP. In addition, the 2008 Q1 Form

10-Q represented that:

In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.

- 9 -

29.     On July 17, 2008, SBI issued a press release announcing its earnings for the quarter

ended June 30, 2008, which stated, in pertinent part:

> Smithtown, NY, July 17, 2008 - Smithtown Bancorp (NASDAQ: SMTB), the parent
> company of Bank of Smithtown, today announced that the Company had earnings for
> the second quarter of 2008 of $3,952,503 or $.40 per share. These figures represent
> an 8% increase in earnings on a year over-year basis and an 11% increase in earnings
> on a linked- quarter basis. Basic earnings per share for the last twelve months now
> stand at $1.51.

> *       *       *

> *Asset quality remained very strong.* Nonperforming loans were $2.8 million or
> .21% of total loans at the end of the quarter.  The increase of 7 basis points in
> nonperformers from March 31st is attributable to one single-family construction loan
> which management believes is well-secured.  Loans 30-89 days past due were at
> $150,000, or .01% of total loans.  Net charge-offs for the first six months were
> $1,400, or .0001% of average total loans.

> The Bank does not hold any sub-prime loans, "Alt-A" loans, option ARMs, 2/28
> ARMs or loans with teaser rates. *The Company's capital ratios also remained
> strong.*  All of the Company's regulatory capital ratios are in the "well capitalized"
> range, with Tier I Leverage at 7.71%, Tier I Risk-Based Capital at 8.67% and Total
> Risk-Based Capital at 10.36%. *The Company regularly monitors its capital ratios
> and evaluates all of its options in light of its asset growth, earnings growth and
> market conditions at the time.*

Defendant Rock commented on the results, stating in pertinent part as follows:

> The current economic environment and competitive environment in our market area
> continues to create opportunities for us. Many of our competitors have had to curtail
> lending due to capital constraints or liquidity constraints caused by sub-prime
> mortgage problems and other difficulties. Other competitors have been acquired by
> large, out-of-state companies that are much less focused on mortgage lending in our
> market area. Finally, the 'conduit' market for commercial mortgage loans has dried
> up entirely.  As a result of these multiple factors, we have greatly increased
> opportunities for permanent commercial mortgage lending.  The loan mix in our
> portfolio is shifting toward more loans on fully-tenanted multi-family and
> commercial buildings with seasoned cash flows.  We are pleased with this shift
> because it enables us to *continue to grow our loan portfolio while maintaining the
> strong credit quality that has been a hallmark of our Company for many, many
> years.* [Emphasis added.]

30.     In response to Defendants' positive statements, the price of SBI common stock rose

7.5%, to close at $18.23 per share.

31.     On August 8, 2008, SBI filed with the SEC its Form 10-Q for the quarter ended June 30, 2008, (the "2008 Q2 Form 10-Q"), which was signed by the Individual Defendants. The 2008 Q2 Form 10-Q included SBI's financial statements for the quarter ended June 30, 2008, which were represented to have been presented in conformity with U.S. GAAP. In addition, the 2008 Q2 Form 10-Q represented that:

- *In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.*

- Our determination of the allowance for loan losses is a critical accounting estimate because it is based on our subjective evaluation of a variety of factors at a specific point in time and involves difficult and complex judgments about matters that are inherently uncertain. In the event that management's estimate needs to be adjusted based on, among other things, additional information that comes to light after the estimate is made or changes in circumstances, such adjustment could result in the need for a significantly different allowance for loan losses and thereby materially impact, either positively or negatively, the Bank's results of operations.

  The allowance for loan losses is established and maintained through a provision for loan losses based on probable incurred losses inherent in the Bank's loan portfolio. *Management, through its Asset Quality Committee, comprised of several members of executive management as well as the chief collection officer, evaluates the adequacy of the allowance on a quarterly basis. Adjustments are made at this time to a level deemed adequate by the Committee*, based on its risk evaluation of the portfolio in its entirety as well as in specific loan details. The allowance is comprised of *both individual valuation allowances and loan pool valuation allowances.*

  *The Bank monitors its entire loan portfolio on a regular basis, with consideration given to detailed analysis of classified loans, repayment patterns, probable incurred losses, past loss experience, current economic conditions and various types of concentrations of credit. Additions to the allowance are charged to expense and realized losses, net of recoveries, are charged to the allowance.*

  Individual valuation allowances are established in connection with specific loan reviews and the asset classification process, including the procedures for impairment testing under Statement of Financial Accounting Standard ("SFAS") No. 114, *"Accounting by Creditors for Impairment of a Loan"*, an Amendment of SFAS Statements No. 5 and 15, and SFAS No. 118, *"Accounting by Creditors for Impairment of a Loan - Income Recognition*

- 11 -

*and Disclosures*", an Amendment of SFAS Statement No. 114. Such valuation, which includes a review of loans for which full collectibility in accordance with contractual terms is not reasonably assured, considers the estimated fair value of the underlying collateral less the costs to sell, if any, or the present value of expected future cash flows, or the loan's observable market value. Any shortfall that exists from this analysis results in a specific allowance for the loan. Pursuant to our policy, loan losses must be charged-off in the period the loans, or portions thereof, are deemed uncollectible. Assumptions and judgments by management, in conjunction with outside sources, are used to determine whether full collectibility of a loan is not reasonably assured. Assumptions and judgments also are used to determine the estimates of the fair value of the underlying collateral or the present value of expected future cash flows or the loan's observable market value. Individual valuation allowances could differ materially as a result of changes in these assumptions and judgments. Individual loan analyses are periodically performed on specific loans considered impaired. The results of the individual valuation allowances are aggregated and included in the overall allowance for loan losses.

In addition to estimating losses for loans individually deemed to be impaired, management also estimates collective impairment losses for pools of loans that are not specifically reviewed. Statistical information regarding the Bank's historical loss experience over a period of time believed to be relevant is weighted very heavily in management's estimate of such losses. However, future losses could vary significantly from those experienced in the past. In addition, management also considers a variety of general qualitative factors and then subjectively determines the amount of weight to assign to each in estimating losses. The factors include, among others, national and local economic conditions, environmental risks, trends in volume and terms of loans, concentrations of credit, changes in lending policies and procedures, and experience, ability, and depth of the Bank's lending staff. Because of the nature of the factors and the difficulty in assessing their impact, management's resulting estimate of losses may not accurately reflect actual losses in the portfolio.

Although the allowance for loan losses has two separate components, one for impairment losses on individual loans and one for collective impairment losses on pools of loans, the entire allowance for loan losses is available to absorb realized losses as they occur whether they relate to individual loans or pools of loans. At June 30, 2008 and December 31, 2007, management believed the allowance for loan losses had been established and maintained at a level adequate to reflect the probable incurred losses in the Bank's loan portfolio. [Emphasis in bold and italics added.]

In addition, the 2008 Q2 Form 10-Q disclosed:

Concentration of loan portfolio

- 12 -

The Bank generally invests a large proportion of its assets in loans secured by commercial and residential real estate properties. While we do not expect a substantial decline in real estate values and economic conditions on Long Island and in the New York metropolitan area, a decline in these values or economic activities could have an impact on the value of collateral securing the loans as well as the ability for the repayment of loans. See a further discussion in "Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations" under "Loans".

*The Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System and the FDIC have observed that commercial real estate is an area in which some banks have become increasingly concentrated. These agencies support banks serving a vital role in their communities by supplying credit for business and real estate development. However, the agencies are concerned that rising commercial real estate loan concentrations may expose institutions to unanticipated earnings and capital volatility in the event of adverse changes in commercial real estate markets. As a result of this concern, the agencies issued Commercial Real Estate Guidance ("CRE guidance") in December 2006 to ensure that institutions with such concentrations maintain strong risk management practices and appropriate levels of capital.* This CRE guidance does not impose any limits on the level of commercial real estate lending made by banks. *The Bank has incorporated several actions in lending administration as part of its enhanced credit risk management processes, including the addition of a credit risk manager and the preparation of concentration reports for review and determination of risk ratings.* [Emphasis added.]

32.    On September 30, 2008, SBI issued press release announcing the completion of a private issuance of 1,965,000 common shares. The stock offering raised $26.3 million in net proceeds.

33.    On October 7, 2008, SBI filed a Form S-3 registration statement (the "2008 Registration Statement") with the SEC offering to sell up to 3,000,000 of its common shares from time to time. The 2008 Registration Statement, which was signed by the Individual Defendants, also offered to sell up to 1,965,000 SBI common shares owned by shareholders who acquired such shares in a private placement that occurred on September 29, 2008.

34.    On October 27, 2008, SBI issued a press release announcing its earnings for the quarter ended September 30, 2008, which stated, in pertinent part as follows:

- 13 -

Smithtown, NY, October 27, 2008 - Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced that the Company had earnings for the third quarter of 2008 of $4,607,000 or $.47 per share. These figures represent a 21% increase in net income and a 21% increase in diluted earnings per share on a year-over-year basis, and a 17% increase in net income and an 18% increase in diluted earnings per share on a linked-quarter basis. Diluted earnings per share for the last twelve months now stand at $1.59. Return on average equity for the last twelve months was 18.31%.

*     *     *

***Asset quality remained very strong.*** Nonperforming loans were $2.8 million or .19% of total loans at the end of the quarter. Loans 30-89 days past due were at $432,000, or .03% of total loans. Net charge-offs for the third quarter were $90,316, resulting from the charge-off of one "small business" line of credit. This charge-off represents less than .01% of average total loans during the third quarter. Net loan charge-offs for the first nine months were $91,346, also representing less than .01% of average total loans for the period. The Bank does not have any sub-prime loans, "Alt-A" loans, option ARMs, 2/28 ARMs or loans with teaser rates. In addition, the Bank does not hold any Fannie Mae or Freddie Mac preferred stock.

***The Company's capital ratios, which have always been strong and in the "well-capitalized" range, grew even stronger as a result of the Company's completion of its $27.5 million capital offering at the end of the quarter.*** At September 30th, Tier I Leverage stood at 9.37%, Tier I Risk-Based Capital at 11.13% and Total Risk-Based Capital at 12.00%. The Company also filed a "shelf registration" which, when approved, will give the Company the ability to issue up to 3 million additional common shares in a public offering. The Company has no present intention to issue any additional common shares, but felt that the often-used tool of a "shelf registration" was a prudent step to take, particularly in light of the recent volatile economic conditions. [Emphasis added.]

Defendant Rock commented on the results, stating in pertinent part as follows:

Even during economic hard times there are good loans to be made. The challenge is to find them, and to have the capital and funding needed to make the loans. Because we don't have any sub-prime mortgages, option ARMs, Fannie or Freddie stock and the other kinds of assets that caused losses to so many of our competitors, we have money to lend and capital to support the growth. So, this has been a time of opportunity for us.

*     *     *

***We are also pleased with the results from our recent capital offering. Despite the 'financial crisis' atmosphere, we were able to raise the full amount of capital we sought at a price that was consistent with the discounts in other similar transactions at the time. The alternative for us during the third quarter was plain:***

- 14 -

*stop growing. We could be happy that we don't have the problems that have hurt others*, and shift to a 'standstill' position to ride out the balance of the storm. Such a choice would also bring the growth in shareholder value to a halt. We decided instead that the opportunities created by these turbulent times are too good to turn away. *The fact that we were one of the few community banking companies able to raise private capital in these times of economic distress represents a recognition of our Company's consistently strong performance over a long period of time. We also feel that the significant earnings growth during the third quarter demonstrates that the opportunities in the marketplace are worthwhile*. [Emphasis added.]

35. In response to Defendants' statements, the price of SBI common stock rose 9.5%, to close at $18.29 per share.

36. On November 7, 2008, SBI filed with the SEC its Form 10-Q for the quarter ended September 30, 2008, (the "2008 Q3 Form 10-Q"), which was signed by the Individual Defendants. The 2008 Q3 Form 10-Q included SBI's financial statements for the quarter ended September 30, 2008, which were represented to have been presented in conformity with U.S. GAAP. In addition, the 2008 Q3 Form 10-Q represented that:

- *In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.*

- Our determination of the allowance for loan losses is a critical accounting estimate because it is based on our subjective evaluation of a variety of factors at a specific point in time and involves difficult and complex judgments about matters that are inherently uncertain. In the event that management's estimate needs to be adjusted based on, among other things, additional information that comes to light after the estimate is made or changes in circumstances, such adjustment could result in the need for a significantly different allowance for loan losses and thereby materially impact, either positively or negatively, the Bank's results of operations.

  The allowance for loan losses is established and maintained through a provision for loan losses based on probable incurred losses inherent in the Bank's loan portfolio. *Management, through its Asset Quality Committee, comprised of several members of executive management as well as the chief collection officer, evaluates the adequacy of the allowance on a quarterly basis. Adjustments are made at this time to a level deemed adequate by the Committee*, based on its risk evaluation of the portfolio in its entirety as well as in specific loan details. The allowance is comprised of both individual valuation allowances and loan pool valuation allowances.

- 15 -

*The Bank monitors its entire loan portfolio on a regular basis, with consideration given to detailed analysis of classified loans, repayment patterns, probable incurred losses, past loss experience, current economic conditions and various types of concentrations of credit. Additions to the allowance are charged to expense and realized losses, net of recoveries, are charged to the allowance.*

Individual valuation allowances are established in connection with specific loan reviews and the asset classification process, including the procedures for impairment testing under Statement of Financial Accounting Standard ("SFAS") No. 114, *"Accounting by Creditors for Impairment of a Loan"*, an Amendment of SFAS Statements No. 5 and 15, and SFAS No. 118, *"Accounting by Creditors for Impairment of a Loan - Income Recognition and Disclosures"*, an Amendment of SFAS Statement No. 114. Such valuation, which includes a review of loans for which full collectability in accordance with contractual terms is not reasonably assured, considers the estimated fair value of the underlying collateral less the costs to sell, if any, or the present value of expected future cash flows, or the loan's observable market value. Any shortfall that exists from this analysis results in a specific allowance for the loan. Pursuant to our policy, loan losses must be charged-off in the period the loans, or portions thereof, are deemed uncollectible. Assumptions and judgments by management, in conjunction with outside sources, are used to determine whether full collectibility of a loan is not reasonably assured. Assumptions and judgments also are used to determine the estimates of the fair value of the underlying collateral or the present value of expected future cash flows or the loan's observable market value. Individual valuation allowances could differ materially as a result of changes in these assumptions and judgments. Individual loan analyses are periodically performed on specific loans considered impaired. The results of the individual valuation allowances are aggregated and included in the overall allowance for loan losses.

In addition to estimating losses for loans individually deemed to be impaired, management also estimates collective impairment losses for pools of loans that are not specifically reviewed. Statistical information regarding the Bank's historical loss experience over a period of time believed to be relevant is weighted very heavily in management's estimate of such losses. However, future losses could vary significantly from those experienced in the past. In addition, management also considers a variety of general qualitative factors and then subjectively determines the amount of weight to assign to each in estimating losses. The factors include, among others, national and local economic conditions, environmental risks, trends in volume and terms of loans, concentrations of credit, changes in lending policies and procedures, and experience, ability, and depth of the Bank's lending staff. Because of the nature of the factors and the difficulty in assessing their impact, management's resulting estimate of losses may not accurately reflect actual losses in the portfolio.

Although the allowance for loan losses has two separate components, one for impairment losses on individual loans and one for collective impairment losses on pools of loans, the entire allowance for loan losses is available to absorb realized losses as they occur whether they relate to individual loans or pools of loans. At September 30, 2008 and December 31, 2007, management believed the allowance for loan losses had been established and maintained at a level adequate to reflect the probable incurred losses in the Bank's loan portfolio. [Emphasis added.]

37.     On December 1, 2008, the 2008 Registration Statement was declared effective by the

SEC.

38.     On January 28, 2009, SBI issued a press release announcing its earnings for the

quarter ended and year ended December 31, 2008, which stated, in pertinent part as follows:

Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced earnings for the year 2008 of $15,723,044, a record level of net income, and a 10% increase over the prior year. This achievement marks the Company's 14th consecutive year of record earnings. These earnings also reflect fully-diluted earnings per share for the year of $1.55, a 5% increase over fully diluted EPS for the prior year.

Earnings for the fourth quarter of 2008 were $3,590,010, or $.31 per share. These earnings reflect a 6% increase over the fourth quarter of last year. These fully-diluted earnings per share represent an 11% decrease as compared with the same period last year as a result of the Company's common stock offering that was completed at the end of the third quarter.

\*       \*       \*

Fourth quarter earnings were reduced by an OTTI [other than temporary impairment] write-down of one trust-preferred pool security. All payments of principal and interest on the security have continued to be made, but "mark-to-market" accounting rules nonetheless require that the security be written down because of the deterioration of the credit quality of the banks in the pool and a diminution of the collateral backing the payment stream. The security was written down by approximately $865,000 to a fair value at 12/31/08 of $825,844. The Bank owns one other trust-preferred pool security in the principal amount of $1,994,416. This security was not "other than temporarily impaired" at year-end as a result of management's analysis of the continued payments, the credit quality of the banks in the pool, the collateral depth and the expected cash flows. Excluding the OTTI write-down of one security, the Company's net income for the fourth quarter would have been up by 21% (rather than up 6%) and fourth quarter EPS would have been the same as last year.

\*       \*       \*

- 17 -

***All of the Bank's credit quality ratios continue to be significantly better than those of peer group banks.*** Nonperforming loans at year-end were at $5.26 million, or .31% of total loans. This figure increased from the previous quarter's end primarily as a result of adding five related three-family homes. The borrower has reported that he has contracts to sell the homes for sums sufficient to satisfy the debts, but whether those sales are concluded or whether the Bank will have to foreclose the mortgages remains to be seen. In spite of this small increase, the .31% nonperforming loan ratio compares very favorably to the peer group ratio of 1.88%.

Loans 30-89 days past due were at $5.23 million, or .31% of total loans also. Similarly, this figure has increased from the previous quarter's end as a result of adding two single-family homes. The borrowers have received offers to purchase the homes at prices that exceed the amount of the debts, but whether those sales will be concluded or whether the Bank will have to foreclose remains to be seen. Again, in spite of this increase, the .31% ratio compares very favorably with the peer group ratio of .94%.

                    *        *        *

Net charge-offs for the fourth quarter were approximately $56,000. Net charge-offs for the year 2008 were approximately $147,000, with $87,000 of these being attributable to loans and $60,000 attributable to the Bank's overdraft protection program. The combined total net charge-offs represent less than .01% of average loans. [Emphasis added.]

Defendant Rock commented on the results, stating in pertinent part as follows:

This past year was the most difficult year for our nation's economy and financial companies since the 1930's. In spite of the 'financial crisis' conditions, we grew earnings at a double-digit pace and significantly expanded our market share. We did so by maintaining those parts of our strategy that worked well in the past, and by shifting other parts of our strategy to take advantage of opportunities created by the year's unusual events and circumstances.

We shifted away from construction lending to reduce the risks created by a slumping housing market and ailing economy. We increased multifamily lending to replace the construction loans with loans that historically have the lowest loss ratios, even during hard economic times. We also increased multi-family lending and other permanent mortgage lending to take advantage of competitive opportunities in our market area.

                    *        *        *

Financial stocks were battered during the course of the year by the steady barrage of bad economic news and, although Smithtown Bancorp was no exception, our Company's strong performance helped the shares fare better than those of most financial companies. All three major stock indexes were 'underwater' for all 253

- 18 -

trading days during 2008. The S&P 500 was down 39%, the worst year in more than seven decades. The SNL index for Northeast banks was down 45%. The price for Smithtown Bancorp shares was down 27.66%, a hard hit to be sure, but nonetheless a demonstration of some resilience compared to other companies.

We do not and could not know what the year ahead holds for our nation's economic system. The new President and Congress have promised an entire revamping of the financial regulatory system and other sweeping economic changes. Some think that we have not yet seen the worst of the 'financial crisis' and that 2009 will be worse than 2008. Others think that changes will take hold and by mid-year we will begin to turn a corner toward more normalcy in our economy.

In any event, no matter what economic conditions lie ahead, we are confident that we will continue our 100 years of strength and stability. When the nation emerges from the current 'financial crisis', we will be even better positioned than before to provide the lending and deposit services that our customers need, and to build the shareholder value that has been the hallmark of our Company for so many years.

39.     On March 12, 2009, SBI filed with the SEC its Form 10-K for the year ended

December 31, 2008, (the "2008 Form 10-K"), which was signed by the Individual Defendants. The

2008 Form 10-K included SBI's financial statements for the year ended December 31, 2008, which

represented, in part:

- *The accounting and reporting policies of Smithtown Bancorp, Inc. and its bank subsidiary, Bank of Smithtown, reflect banking industry practices and conform to U.S. generally accepted accounting principles.*

- *The allowance for loan losses is a valuation allowance for probable incurred credit losses. Loan losses are charged against the allowance when management believes the uncollectibility of a loan balance is confirmed. Subsequent recoveries, if any, are credited to the allowance. Management estimates the allowance balance required using past loan loss experience, the nature and volume of the portfolio, information about specific borrower situations and estimated collateral values, economic conditions and other factors. Allocations of the allowance may be made for specific loans, but the entire allowance is available for any loan that, in management's judgment, should be charged off.*

    The allowance consists of specific and general components. The specific component relates to loans that are individually classified as impaired or loans otherwise classified as substandard or doubtful. The general component covers non-classified loans and is based on historical loss experience adjusted for current factors.

A loan is considered impaired when, based on current information and events, it is probable that the Bank will be unable to collect the scheduled payments of principal or interest when due according to the contractual terms of the loan agreement. Factors considered by management in determining impairment include payment status, collateral value and the probability of collecting scheduled principal and interest payments when due. Loans that experience insignificant payment delays and payment shortfalls generally are not classified as impaired. Management determines the significance of payment delays and payment shortfalls on a case-by-case basis, taking into consideration all of the circumstances surrounding the loan and borrower, including the length of the delay, the reasons for the delay, the borrower's prior payment record and the amount of the shortfall in relation to the principal and interest owed. Impairment is measured on a loan by loan basis for commercial and construction loans by either the present value of expected future cash flows discounted at the loan's effective interest rate, the loan's obtainable market price, or the fair value of the collateral if the loan is collateral dependent. Large groups of smaller balance homogeneous loans are collectively evaluated for impairment. Accordingly, the Bank does not separately identify individual consumer and residential loans for impairment disclosures. [Emphasis added.]

The 2008 Form 10-K also represented:

The Bank generally invests a large proportion of its assets in loans secured by commercial and residential real estate properties on Long Island and the New York metropolitan area. While the Company does not expect a substantial decline in real estate values and economic conditions on Long Island and in the New York metropolitan area, a decline in these values or economic activities could have an impact on the value of collateral securing the loans as well as the ability for the repayment of loans. In addition, at December 31, 2008, construction loans represented 23% of the Company's loan portfolio and multi-family loans represented 18% of its loan portfolio. See a further discussion in "Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations" under "Loans".

***The Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System and the FDIC have observed that commercial real estate is an area in which some banks have become increasingly concentrated. These agencies support banks serving a vital role in their communities by supplying credit for business and real estate development. However, the agencies are concerned that rising commercial real estate loan concentrations may expose institutions to unanticipated earnings and capital volatility in the event of adverse changes in commercial real estate markets.*** As a result of this concern, the agencies issued Commercial Real Estate Guidance ("CRE Guidance") in December 2006 to ensure that institutions with such concentrations maintain strong risk management practices and appropriate levels of capital. This CRE Guidance does not impose any limits on the level of commercial real estate lending made by banks. The Bank has incorporated several actions in lending administration as part of its enhanced credit risk management processes, including the addition of a credit risk manager and the

preparation of concentration reports for review and determination of risk ratings. [Emphasis added.]

40.    On April 29 2009, SBI issued a press release announcing its earnings for the quarter

ended March 31, 2009, which stated, in pertinent part as follows:

> Smithtown, NY, April 29, 2009 - Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced earnings for the first quarter of 2009 of $3,616,425, or $.31 per share. These figures reflect a 1% increase in net income over the first quarter of last year, and a 16% decrease in fully-diluted earnings per share over the same period last year as a result of the Company's common stock offering that was completed at the end of the third quarter of 2008.

*      *      *

> ***All of the Bank's credit quality ratios continue to be significantly better than those of peer group banks.*** Nonperforming loans at quarter-end were at $8.4 million, or .46% of total loans. This figure increased from the previous quarter's end primarily as a result of adding one home loan that is presently under foreclosure. A written offer has been made by a third party to purchase the property for an amount sufficient to satisfy the debt, but whether that sale will be concluded or whether the Bank will have to complete its foreclosure of the mortgage remains to be seen. During the first quarter, under similar circumstances, the Bank's borrowers sold three homes for amounts which satisfied the debts on those properties in full, thereby eliminating those loans from the nonperforming category prior to completion of the foreclosure. In any event, in spite of this small increase, the .46% nonperforming loan ratio compares very favorably to the ratio of 2.40% for the peer group of 293 banks in the nation with assets from $1 billion to $3 billion. [Emphasis added.]

Defendant Rock commented on the results, stating in pertinent part as follows:

> During these difficult times, which many observers think is at or near the bottom of the economic cycle, we believe that we are not only weathering the storm around us, but also taking advantage of opportunities to emerge from the 'financial crisis' as one of the winners for the future.

> Changes in the competitive marketplace have created favorable opportunities for growth, both in core deposits and loans. We are seeking to take advantage of those opportunities, even if it means moderating income growth during these difficult times, in order to create a more valuable franchise for the future. So, for example, early in the first quarter, when the core deposit inflows were so rapid that we could not employ the funds profitably at the same pace, nonetheless, we chose not to take steps to slow or stop the inflows, in spite of the downward pressure on the margin.

> Fortunately, as we look to the future, both factors that created downward pressure on the net interest margin during the first quarter seem to be in the past. The Fed

- 21 -

interest rate cuts, though they have taken their toll, would seem to be done. And with respect to the investment of deposit inflows, net loan growth has caught up with, and passed by, net deposit growth. For the month of January, deposit growth was $147 million while loan growth was $19 million. By February, deposit growth was $67 million and loan growth was $61 million. For the first three weeks of April, deposit growth was $12 million and loan growth was $66 million. So, as a result of our increasing ability to employ the funds and the likelihood that Fed interest rate cuts have come to an end, we expect that the margin has bottomed out and may gradually begin to increase over time.

41.     On May 8, 2009, SBI filed with the SEC its Form 10-Q for the quarter ended March

31, 2009, (the "2009 Q1 Form 10-Q"),which was signed by the Individual Defendants. The 2009 Q1

Form 10-Q included SBI's financial statements for the quarter ended March 31, 2009, which were

represented to have been presented in conformity with U.S. GAAP. In addition, the 2009 Q1 Form

10-Q represented that:

> In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.

42.     On May 20, 2009, SBI announce that it raised net offering proceeds of $26.5 million

from the public sale of 2.8 million common shares.

43.     On June 29, 2009, SBI issued a press release announcing the completion of a private

issuance of 1,965,000 common shares. The stock offering raised $26.3 million in net proceeds.

44.     On July 28, 2009, SBI issued a press release announcing that it and the Bank of

Smithtown sold $14 million of the Bank's subordinated notes due July 1, 2019, and warrants to

purchase up to 350,000 shares of SBI's common stock in a private placement to institutional

accredited investors.

45.     On July 29, 2009, SBI issued a press release announcing its earnings for the quarter

ended June 30, 2009, which stated, in pertinent part:

> Smithtown, NY, July 29, 2009 - Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced earnings for the second quarter of

2009 of $3.413 million, or $.26 per share, beating analyst estimates by 2 cents per share, but down compared to $.31 per share during the first quarter of this year. Earnings were reduced by the industry-wide FDIC special assessment during the second quarter to replenish losses to the deposit insurance fund caused by bank failures during the past year. In addition to its regular quarterly deposit insurance premiums, Bank of Smithtown incurred a one-time special assessment of approximately $1.1 million in the second quarter. Without this charge, earnings would have been $4.052 million, up 12% from the previous quarter. EPS would have been $.31, including the impact of the additional shares issued on May 20th in connection with the Company's $30 million common stock offering.

Defendant Rock commented on the results, stating in pertinent part as follows:

> Given the difficulties of these economic times, we believe that our results for the quarter are moderately successful. We have a strong capital base, we continue to grow loans and core deposits at a strong pace, and we continue to grow our revenue. Expenses are higher than we would like, but most of that is attributable to economic factors beyond our control, such as unprecedented FDIC insurance costs. Without these costs, we would be growing net income at a double-digit pace, which would make the additional capital we have raised accretive to earnings per share quickly.

> With respect to asset quality, as I have said previously, in this economic environment, we expect the number of slow-paying and non-paying customers to be higher than usual for a while. With more than five million people having lost their jobs and more than 6,000 bankruptcies being filed every day, it would be unrealistic for us to expect that none of those events will touch Bank of Smithtown. At the same time, however, because 97% of our loans are secured by mortgages on real estate, usually protected with wide loan-to-value ratios, we do not expect large, unmanageable losses in spite of the dim economic environment.

> At the same time we weather the difficulties of the 'Great Recession', we continue to take advantage of marketplace disruptions to build our customer base on both the loan and deposit sides of the ledger. Our new branches have been very successful, helping us to grow core deposits by 53% over the last twelve months. We fully expect the new branches that open later this year and next year will be equally successful.

46. On August 7, 2009, SBI filed with the SEC its Form 10-Q for the quarter ended June 30, 2009, (the "2009 Q2 Form 10-Q"), which was signed by the Individual Defendants. The 2009 Q2 Form 10-Q included SBI's financial statements for the quarter ended June 30, 2009, which were represented to have been presented in conformity with U.S. GAAP. In addition, the 2009 Q2 Form 10-Q represented that:

- 23 -

In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.

47.     On September 24, 2009, SBI filed a Form S-3 registration statement (the "2009 Registration Statement") with the SEC offering to sell from time to time up to $100 million of unsecured senior or subordinated debt securities; common shares; preferred shares; depositary shares; warrants to purchase other securities; and units consisting of any combination of the above securities. The 2009 Registration Statement also offered to sell up to 475,000 SBI common shares issuable upon the exercise of warrants purchased in private placements that occurred on June 29, 2009 and July 27, 2009 by selling shareholders.

48.     On November 2, 2009, SBI issued a press release announcing its earnings for the quarter ended September 30, 2009, which stated, in pertinent part as follows:

> Smithtown, NY, November 2, 2009 - Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced earnings for the third quarter of 2009 of $897,723, or $.06 per share. *Earnings were reduced by a provision of $10 million to the loan loss reserve.* Net income for the first nine months of this year was $7.927 million, or $.59 per share. Fully diluted earnings per share for the last twelve months now stand at $.89. [Emphasis added.]

Defendant Rock commented on the results, stating in pertinent part as follows:

> *Earnings were negatively impacted during the third quarter by two factors* related to the continued economic recession. First, as many Long Island economists have agreed, the various impacts of *the recession* appear to have hit this region later than in other parts of the country. Second, as has been observed frequently by the Federal Reserve and in financial journals, *commercial real estate difficulties* appear to be surfacing later in the cycle than other manifestations of the recession (such as job losses, home foreclosures and reduced retail sales).

> Although nonperforming loans and charge-offs remain better than peer bank averages, we nonetheless have to increase loan loss provisions to protect against possible future losses based upon the deterioration observed in our loan portfolio during the third quarter. *We also expect levels of nonperforming loans, loan loss provisions and charge-offs to continue to be higher than usual during the fourth quarter of this year and possibly into the first quarter of next year as commercial real estate markets and the region's economy continue to struggle.*

- 24 -

But as earnings lag behind our historical success due to the economic woes of the nation and the region, *we nonetheless continue to show strong signs of building a valuable franchise*. Core deposits have grown this year by 46%, with total deposits now exceeding $2 billion. We continue to identify and open successful new branch locations at a reasonable cost, as borne out by both our deposit figures and expense ratios. When we look at the steadily-increasing stream of net interest income we are building by matching strong core deposit growth with permanent mortgage lending, we feel that when economic conditions permit us to return to more normalized provisions, we will have a Company with solid earnings growth and an excellent deposit franchise. [Emphasis added.]

49.     As a result of these disclosures, the price of SBI stock declined from a closing price on the previous trading day of $10.35 per share to $8.91 on November 2, 2009, an approximate 14% decline. Thereafter, the price of SBI common stock continued to decline as a portion of the artificial inflation came out of the stock price.

50.     On November 19, 2009, SBI announced that:

•       John Romano was named President and Chief Operating Officer SBI and the Bank. Mr. Romano had served as an Executive Vice President of SBI and the Bank, and the Chief Retail Officer of the Bank, since February 2000;

•       Christopher Becker was named Executive Vice President and Chief Financial Officer of the SBI and the Bank. Mr. Becker had served as an Executive Vice President of the Bank since April 2009; and

•       Defendant Anita Florek was named Executive Vice President of the Bank and the Chief Accounting Officer of SBI and the Bank.

51.     On December 4, 2009, SBI announced that Tom Stevens resigned from his positions of Executive Vice President and Chief Commercial Lending Officer.

52.     On December 22, 2009, SBI issued a press release announcing its Board of Directors had decided not to declare a cash dividend for the fourth quarter of 2009. Defendant Rock stated in pertinent part as follows:

*We expect elevated levels of nonperforming loans and loan loss provisions for the near future*, as well as other challenges posed by the current economic and regulatory environment. Therefore, *we believe that this is a time to conserve capital*. During the last recession and real estate downturn of the early 1990's, the Company took similar steps by temporarily halting the cash dividend, and subsequently

- 25 -

emerged stronger and more profitable. *We believe that the fundamentals of the Company remain sound, and once we work through the problem credits precipitated by the recession and current real estate downturn*, we expect to return to levels of profitability more consistent with the past.

53.    As a result of these disclosures, the price of SBI stock declined by approximately 7.5% to $4.65 per share to $8.91 on December 22, 2009 as a portion of the artificial inflation came out of the stock price.

54.    The statements referenced above in ¶¶24-26, 28, 29, 31, 34, 36, 38-41, 45, 46 and 48 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that the Company's financial results were artificially inflated due to SBI's material understatement of its loan loss reserves and SBI's failure to state certain of its assets at their true fair value;

(b)    that the Company improperly delayed the recognition of its impaired assets in order to inflate its reported income and asset quality;

(c)    that the Company's internal and disclosure controls were materially deficient;

(d)    that the Company, through its subsidiary, was engaged in unsafe and/or unsound banking practices including, but not limited to: failing to manage the Bank's asset quality, credit administration and loan and appraisal review processes; failing to comply with the *Interagency Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices* (Financial Institution Letter ("FIL") 104-2006, issued December 12, 2006) and *Managing Commercial Real Estate Concentrations in a Challenging Environment* (FIL-22-2008, issued March 17, 2008); maintaining a commercial real estate loan concentration that was not commensurate with the Bank's business strategy, management expertise, size, and location; failing to document lines of authority and operational responsibilities within the loan department; failing to identify, monitor, and

- 26 -

timely report past due loans, loans with emerging credit weaknesses and exceptions to loan policy; failing to maintain adequate underwriting standards and procedures for loans, loan renewals and appraisal reviews; failing to maintain adequate Board and Audit Committee oversight of the Bank's independent loan review function; employing an appraisal policy that failed to ensure reappraisals or evaluations take place when real estate collateral deteriorates; employing a construction loan policy that failed to ensure that waivers of liens or the equivalent are obtained before advances made on construction projects; failing to comply with Part 323 of the FDIC's Rules and Regulations; 12 CF.R. Part 323; *Interagency Guidelines on Real Estate Appraisals and Evaluations* (FIL 74-94, issued November 11, 199); and the *Statement of Policy on Uniform Retail Credit Classification and Account Management Policy* (FIL-40-2000, issued June 29, 2000); failing to maintain an effective internal loan watch list and a written plan to lessen the risk position in each line of credit identified as a problem credit on the Bank's internal loan watch list; failing to timely charge off loans; failing to maintain an appropriate allowance for loan loss; and failing to restrict credit to unsuitable borrowers;

(e)  as a result of the foregoing, SBI's financial statements were not fairly presented in conformity with U.S. GAAP and were materially false and misleading; and

(f)  based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its prospects and growth.

55.  Then, on February 1, 2010, SBI issued a press release announcing its fourth quarter and full year 2009 results (the "2009 Q4 Press Release"). With regard to the Company's financial results, the press release stated in part:

> Smithtown, NY, February 1, 2010 - Smithtown Bancorp (NASDAQ: SMTB) today announced a loss of *$19.8 million* for the fourth quarter of 2009, or ($1.34) per fully diluted share.  Operating earnings were more than offset by a provision of *$38 million to the loan loss reserve and a write-down of an other real estate owned*

*property of $7 million.* The net loss for the year was $11.8 million, or ($.87) per fully diluted share.

*   *   *

The allowance for loan losses was $38.5 million at December 31, 2009, or 1.84% of total loans. Asset quality deterioration became an increasing problem in 2009 as the economic recession, especially commercial real estate difficulties, hit our region later than other areas of the country. Nonperforming loans ended the quarter at $130.2 million, or 6.23% of total loans. Loans 30-89 days past due decreased from $51.2 million at the end of the third quarter to $20.8 million, or .99% of total loans, at the end of the fourth quarter. Net charge-offs for the fourth quarter were $22.6 million and for the year were $23.8 million, or 1.22% of average loans. [Emphasis added.]

The 2009 Q4 Press Release also disclosed:

> *The Company further announced that, on January 29, 2010, its subsidiary, Bank of Smithtown, entered into a Consent Agreement with the Federal Deposit Insurance Corporation (FDIC) and a parallel Consent Order with the New York State Banking Department (NYSBD), hereinafter collectively referred to as the "Consent Agreement."*

*   *   *

> Regarding the Consent Agreement with the FDIC and NYSBD, the *Bank is required to improve credit administration, loan underwriting and internal loan review processes and maintain an adequate allowance for loan losses. Other required actions include the implementation of plans to reduce classified assets, decrease the Bank's concentration in commercial real estate loans and increase profitability. The Bank's payment of dividends and growth in average assets require prior approval of the FDIC and NYSBD. In addition, the Bank is required to maintain no later than June 30, 2010, Tier 1 Capital at least equal to 7% of Total Assets, Tier 1 Risk-Based Capital at least equal to 9 percent of Total Risk-Weighted Assets and Total Risk-Based Capital at least equal to 11 percent of Total Risk-Weighted Assets.* [Emphasis added.]

56.    In response to this announcement, on the next trading day, shares of the Company stock fell approximately 15%, to close at $4.60 per share, on extremely heavy trading volume.

57.    The market for SBI common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, SBI common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired SBI common stock relying upon

- 28 -

the integrity of the market price of SBI common stock and market information relating to SBI, and have been damaged thereby.

58.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of SBI common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

59.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about SBI's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of SBI and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## Additional Scienter Allegations

60.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in

- 29 -

the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding SBI, their control over, and/or receipt and/or modification of SBI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning SBI, participated in the fraudulent scheme alleged herein.

61.     Defendants were further motivated to engage in this course of conduct in order to raise much needed capital by enabling SBI to repeatedly sell its securities at artificially inflated prices to unsuspecting investors during the Class Period.

### Loss Causation/Economic Loss

62.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of SBI common stock and operated as a fraud or deceit on Class Period purchasers of SBI common stock by failing to timely disclose SBI's client terminations and the material adverse effect such terminations were then having on the Company's operations. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of SBI common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of SBI common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

63.     Defendants' false and misleading statements had the intended effect and caused SBI common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $24.50 per share on September 29, 2008.

64.     As a direct result of the disclosures detailed herein, the price of SBI common stock fell precipitously. These declines removed the inflation from the price of SBI common stock,

causing real economic loss to investors who had purchased SBI common stock during the Class Period.

65. The declines in the price of SBI common stock after this disclosure came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines in SBI common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of SBI common stock and the subsequent significant decline in the value of SBI common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

66. At all relevant times, the market for SBI common stock was an efficient market for the following reasons, among others:

(a) SBI common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) as a regulated issuer, SBI filed periodic public reports with the SEC and the NASDAQ;

(c) SBI regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- 31 -

(d)     SBI was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

67.     As a result of the foregoing, the market for SBI common stock promptly digested current information regarding SBI from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of SBI common stock during the Class Period suffered similar injury through their purchase of SBI common stock at artificially inflated prices and a presumption of reliance applies.

<strong>No Safe Harbor</strong>

68.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of SBI who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

72.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SBI common stock. Plaintiff and the Class would not have purchased SBI common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

73.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of SBI common stock during the Class Period.

- 33 -

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

74.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.    The Individual Defendants acted as controlling persons of SBI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of SBI, and their ownership of SBI stock, the Individual Defendants had the power and authority to cause SBI to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

- 34 -

DATED: February 25, 2010

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD



SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

- 35 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

WATERFORD TOWNSHIP POLICE & FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*In re Vertex Pharmaceuticals Incorporated Sec. Litig.*, No. 1:08-cv-10414-RGS (D. Mass.)

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

SMITHTOWN

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23 day of FEB , 2010.

WATERFORD TOWNSHIP POLICE &
FIRE RETIREMENT SYSTEM

By: _____

Its: _____

- 2 -

SMITHTOWN

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 08/07/2009 | 1,450 | $12.03 |
| 08/10/2009 | 550 | $12.62 |
| 08/31/2009 | 250 | $13.38 |
| 09/01/2009 | 2,150 | $13.11 |
| 09/02/2009 | 1,100 | $12.97 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 12/04/2009 | 2,650 | $6.07 |
| 12/07/2009 | 2,850 | $6.25 |