UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
WATERFORD TOWNSHIP POLICE & FIRE
RETIREMENT SYSTEM, Individually and On
Behalf Of All Others Similarly Situated,

        Plaintiffs,

- against -

SMITHTOWN BANCORP., INC., et al.,

        Defendants.
-----------------------------------------------------------X

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ JUL 18 2014 ★
BROOKLYN OFFICE

**MEMORANDUM & ORDER**

10-CV-864 (SLT) (RER)

**TOWNES, United States District Judge:**

  Lead Plaintiffs Waterford Township Police & Fire Retirement System and Michael L. Cox, on behalf of themselves and other similarly-situated investors (collectively, "Plaintiffs") who purchased common stock between March 13, 2008, and February 1, 2010 (the "Class Period"), bring this putative class action for securities fraud against Smithtown Bancorp, Inc., ("SBI"), People's United Financial, Inc., ("People's United") and two executives, (collectively, "Defendants"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and Securities and Exchange Commission ("SEC") Rule 10b-5.

  Defendants now move to dismiss the second consolidated amended class action complaint ("SCAC") with prejudice pursuant to Federal Rules of Civil Procedure 9 and 12(b)(6) and to strike certain allegations pursuant to Rule 12(f). Defendants argue that the SCAC does not meet basic pleading standards, relies on improper sources, lacks facts showing scienter, and ultimately fails to state a claim for securities fraud. Plaintiffs oppose the motion and separately move to lift the PSLRA stay to allow for a single deposition.

# I. BACKGROUND

## A. Facts

The SCAC alleges two species of securities fraud, whereby Defendants sought to inflate SBI's common stock price to allow for a series of capital-raising transactions. First, Plaintiffs assert a series of material misstatements made in the form of press releases and SEC filings. Second, Plaintiffs allege that Defendants engaged in a course of conduct amounting to a fraudulent scheme by commissioning fraudulent appraisals of real property, holding back new corrective appraisals until after an SEC disclosure deadline, advancing distressed borrowers funds to make interest payments, failing to adequately staff the loan review office, failing to maintain an adequate allowance for estimated loan losses ("ALLL"), and issuing falsely positive statements about the institution's financial well-being and loan review infrastructure.

For purposes of this motion, the following allegations are taken as true from the SCAC, which completely replaces Plaintiffs' prior pleadings. See International Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

### 1. The Defendants

SBI is a New York State corporation and bank holding company with one direct and wholly owned subsidiary, the Bank of Smithtown (the "Bank").[1] (SCAC ¶ 11). During the Class Period, Bradley E. Rock ("Rock") served as Board Chairman, President and Chief Executive Officer, and Anita M. Florek ("Florek") served first as Executive Vice President, then Chief Financial Officer, and finally Chief Accounting Officer of SBI and the Bank, (collectively, "Individual Defendants"). (SCAC ¶¶ 12-13). Individual Defendants had certain reporting

---

[1] On November 30, 2010, People's United merged with and acquired SBI, assuming the latter's liabilities. (SCAC ¶ 10).

2

obligations under federal securities laws, the authority to control or issue press releases, and access to confidential matters concerning the Bank's operations and financial condition, including material adverse non-public information. (SCAC ¶¶ 22, 24, 25).

### 2. Loan Portfolio Growth

SBI's primary source of revenue during the Class Period was the interest income it received on its loan portfolio. (SCAC ¶ 31). As interest rates declined, SBI "rapidly grew" this loan portfolio to offset the corresponding reduction in net interest income, writing new loans sourced by outside mortgage brokers. (SCAC ¶¶ 32, 33, 43). Between December 2007 and September 2009, the Bank's loan portfolio more than doubled, surpassing $2 billion. (SCAC ¶ 34). Between December 2007 and March 2010, however, the Bank's nonperforming loans increased from $687,000 (0.07% of total loans) to $203,569,000 (more than 10% of total loans). (SCAC ¶ 35). Despite this substantial increase, ALLL as a percentage of nonperforming and total loans actually decreased throughout the Class Period. (SCAC ¶¶ 36, 38, 39).

Moreover, the Bank did not possess the infrastructure necessary to manage such rapid growth. (SCAC ¶ 43). According to Aldo Columbano, a Controller and Vice-President at SBI and the Bank during the Class Period, the Bank employed only one, semi-retired, part-time credit loan officer to review the entire loan portfolio. (SCAC ¶¶ 43, 44).

### 3. Masking Loan Delinquency

According to a senior bank executive (the "Toussie Informant"),[2] the Bank pulled out "all stops" in 2008 and 2009 to "mask" the volume of past due loans. (SCAC ¶ 47). To that end, the Bank commissioned and received a significant number of real property appraisals that

---

[2] The Toussie Informant is the source of allegations in a state court amended complaint, filed May 25, 2011, by Robert I. Toussie, a real estate investor and entrepreneur, against SBI, Rock, and Rock's son for securities fraud. See Robert I. Toussie v. Smithtown Bankcorp, Inc. et al., No 500164/2010 (Sup. Ct. Kings County).

3

substantially overstated the value of the loans' underlying collateral. (SCAC ¶ 48). The Bank was aware that these appraisals were "rife with methodological defects," such as failing to perform proper title searches. (SCAC ¶ 48). At a meeting held in August or September 2009, Rock advised the Bank's loan officers that the Federal Deposit Insurance Corporation ("FDIC") had directed the Bank to reappraise the properties securing dozens of the Bank's loans. (SCAC ¶ 49). However, Rock "specifically directed" that any new appraisals not be delivered to the Bank before November 13, 2009, when the Bank expected to file its SEC disclosure for the third quarter of that year. (SCAC ¶ 49).

Furthermore, the Bank engaged in a pattern and practice of advancing funds to distressed borrowers, allowing them to remain nominally current on outstanding loans by paying interest using the Bank's own money – even where the relevant projects had been abandoned. (SCAC ¶ 51).

### 4.  Misleading Statements

Plaintiffs allege that Defendants made numerous misleading statements during the Class Period. In 10-K and 10-Q reports, Defendants consistently represented that SBI's disclosure controls and procedures, managed by Rock and Florek, were done in conformance with generally accepted accounting principles ("GAAP") and certified that SBI had fairly presented its financial condition in all material respects. (SCAC ¶¶ 73, 74, 76, 86, 111, 141, 149). Defendants stated that the Bank regularly monitored its entire loan portfolio, that loan losses were charged-off as the loans were deemed uncollectible, and that the Bank commissioned periodic appraisals so as to carry property at estimated fair value. (SCAC ¶¶ 77, 122, 124). Defendants' SEC reports also indicated that SBI's nonperforming loans as a percentage of total loans remained at a "very low level" and that ALLL provided "adequate" coverage based on an effective risk evaluation of the entire portfolio. (SCAC ¶¶ 88, 98, 100, 113). In these filings, Defendants stressed that SBI's

4

asset ratios were better than its peer group banks and noted that the fair value of impaired loans was "generally based on recent real estate appraisals." (SCAC ¶ 134).

Additionally, from April 2008 to July 2009, Defendants issued a series of positive press releases. SBI represented that the Bank maintained strong asset quality, had tightened construction loan standards, was well-capitalized, and that its credit quality ratios were significantly better than those of its peers, even in the midst of the financial crisis. (SCAC ¶¶ 81, 83, 93, 95, 104, 106, 118, 120, 130). Defendants made a point of attributing increases in nonperforming loans to only a handful of delinquencies. (SCAC ¶¶ 81, 88, 93, 100, 106, 118). Defendants also reported a series of capital-raising transactions, totaling approximately $93 million. (SCAC ¶¶ 3, 102, 136, 137, 138). Rock touted the Bank's ability to raise private capital during a time of such economic distress. (SCAC ¶ 108). The price of SBI common stock typically rose on the day of each press release. (SCAC ¶¶ 85, 96, 110). Plaintiffs allege that Defendants' course of conduct and misleading statements allowed them raise significant capital by delaying recognition of approximately $100 million in losses during the Class Period. (SCAC ¶ 41).

### 5. Losses Recorded

From November 2009 through February 2010, SBI announced multiple charges to increase its ALLL, that it would write down the value of certain property, that its Chief Commercial Lending Officer had resigned, and that management expected elevated levels of nonperforming loans and ALLL "for the near future." (SCAC ¶¶ 144, 146, 152, 153). Rock attributed the negative impact on earnings to the recession and commercial real estate difficulties. (SCAC ¶ 146). Additionally, SBI disclosed that the Bank had entered into parallel consent agreements, (jointly, the "Consent Order"), with the FDIC and the New York Banking Department, pursuant to which the Bank was required, inter alia, to "improve credit

administration, loan underwriting and internal loan review processes, maintain an adequate allowance for loan losses," and increase capital. (SCAC ¶ 159). The price of SBI common stock fell approximately 14%, 7.5%, and 15%, respectively, after these announcements. (SCAC ¶¶ 148, 155, 160).

Just after the Class Period closed, SBI recorded additional charges of $52.5 million in the first half of 2010 to "true up its ALLL," depleting the capital necessary to operate in compliance with regulations and ultimately forcing a merger with People's United. (SCAC ¶ 169). Plaintiffs allege they suffered economic loss when the artificial inflation – created by Defendants' fraudulent conduct and statements – came out of the SBI common stock price. (SCAC ¶ 4).

### B. Procedural History

On March 29, 2013, the Court dismissed Plaintiffs' amended complaint without prejudice, primarily due to the problematic form of the pleading. (Docket No. 39 at 8). Plaintiffs filed the SCAC on April 30, 2013, alleging for the first time facts drawn from the Toussie Informant, a confidential witness referenced in a separate state court complaint. (Docket No. 40). Defendants move to strike these and other allegations as well as to dismiss the SCAC for failing to state a claim. (Defs. Mem. at 1-4).

## II. MOTION TO STRIKE

Defendants ask the Court to strike allegations derived from the Consent Order and from two confidential witnesses. (Defs. Mem. at 14-17). Rule 12(f) permits a court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." While "[r]esolution of a Rule 12(f) motion is left to the district court's discretion," E.E.O.C. v. Bay Ridge Toyota, Inc., 327 F. Supp. 2d 167, 170 (E.D.N.Y. 2004), "motions to strike are viewed with disfavor and

infrequently granted," In re Merrill Lynch & Co., Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003).

## A. Consent Order

Defendants rely primarily on Lipsky v. Commonwealth United Corp., 551 F.2d 887 (2d Cir. 1976), for their contention that the Consent Order may not be cited in the SCAC. (Defs. Mem. at 14-15). In that case, the Second Circuit explained that "a consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues . . . can not be used as evidence in subsequent litigation between that corporation and another party" to prove liability. Lipsky, 551 F.2d at 893. A plaintiff would therefore be "prohibited from relying on the [consent order] to plead the underlying facts of liability" even where it "included certain factual findings." In re Platinum & Palladium Commodities Litig., 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011) (internal quotation marks omitted). Although "[d]istrict courts have read Lipsky with varying degrees of breadth," VNB Realty, Inc. v. Bank of America Corp., No. 11 Civ. 6805 (DLC), 2013 WL 5179197, at *3 (S.D.N.Y. Sept. 16, 2013) (comparing cases), Defendants' motion to strike in this case similarly targets a consent agreement that was the product of a settlement with a federal agency.

Plaintiffs respond that they may at least rely on the Consent Order to allege that "Defendants began to increase their reported nonperforming loans and ALLL in mid-2009 not because of any acceleration of the deterioration of [SBI]'s loan portfolio, but because they were effectively forced to do so by the FDIC, which investigated the Bank" at that time. (Pls. Opp. at 16 (emphasis in original)). Plaintiffs point to United States v. Gilbert, 668 F.2d 94, 97 (2nd Cir. 1981), where the court allowed a consent decree between the defendant and the SEC to be introduced at a criminal trial to show the defendant's awareness of SEC requirements – not to prove the underlying facts of liability. Reliance on Gilbert is misplaced here. At bottom,

7

Plaintiffs claim that the FDIC investigation and resulting Consent Order show that Defendants were, in fact, fraudulently understating delinquent loans and maintaining inadequate ALLL. Defendants' motion to strike references to the Consent Order is granted.³

### B. Confidential Witnesses

With regard to Columbano, who is no longer anonymous, the Court declines to consider an affidavit offered outside the pleadings by Defendants. See Kopec v. Coughlin, 922 F.2d 152, 154 (2d Cir. 1991) ("The court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment . . . and afford all parties the opportunity to present supporting material.").

As to the Toussie Informant, whose statements are drawn from a separate state court pleading against SBI and Rock, the Second Circuit has not definitively ruled on whether plaintiffs may utilize allegations of confidential informants drawn from other complaints. See In re Lehman Bros. Sec. & Erisa Litig., No. 10 Civ. 6637 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) ("[T]he Second Circuit does not appear to have ruled on this exact issue."). Indeed, district courts in this circuit have taken different positions on the question. See, e.g., Homeward Residential, Inc. v. Sand Canyon Corp., No. 12 Civ. 7319 (AT), 2014 WL 572722, at *8 (S.D.N.Y. Feb. 14, 2014) (collecting cases); 380544 Canada, Inc. v. Aspen Technology, Inc., 544 F. Supp. 2d 199, 225 (S.D.N.Y. 2008) ("Although the confidential informants are not personally known to Plaintiffs or Plaintiffs' counsel, the fact that the informants' accounts are derived from an earlier pleading in a different case simply does not render the instant pleading inadequate.").

---

³ The Lipsky court noted that it did not "understand how [the plaintiff] is harmed by the elimination of [such] references" because "[i]f the trial judge finds that testimony or documents . . . are admissible . . . surely [the plaintiff] need not allude to this evidence in his complaint as a condition for its admission." 551 F.2d at 894.

Given the "strong presumption against striking portions of the pleadings," In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012), the Court declines to strike the allegations attributed to Columbano and the Toussie Informant in this case.

### III. MOTION TO DISMISS

#### A. Rule 12(b)(6) Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-56 (2007). A court's role at this stage is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id. at 570.

#### B. 10(b) Claim

Count One alleges a violation of Section 10(b) and Rule 10b-5, promulgated thereunder. (SCAC ¶¶ 182-86). Under these provisions, it is unlawful for any person:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

9

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. In this case, Plaintiffs allege a violation based on material misstatements under Rule 10-5(b), as well as "scheme liability" under Rule 10b–5(a) and (c).

### 1. Material Misstatements Theory

To state a claim for material misstatements under Rule 10-5(b), a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Pac. Inv. Mgmt. Co. v. Mayer Brown LLP, 603 F.3d 144, 151 (2d Cir. 2010). Moreover, such claims sound in fraud and must meet the requirements of both Rule 9(b) and the PSLRA. A complaint based upon misstatements therefore must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (citing Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)).

For a statement to qualify as material, there must be a substantial likelihood that the misstated or omitted fact "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d at 470 (internal quotation marks omitted). The Second Circuit has made clear that optimistic statements and "generalizations about a company's business practices and integrity . . . so general that a reasonable investor would not depend on those statements" are typically not actionable as "mere business 'puffery.'" Boca Raton Firefighters and Police Pension Fund v. Bahash, 506 Fed. App'x 32, 37 (2d Cir. 2012) (citations, internal quotation

10

marks, and bracketing omitted). However, courts have declined to dismiss actions on materiality grounds where, for example, a plaintiff alleges a "glaring disparity" between a defendant's actual operations and public statements of conservative lending standards and disciplined focus. Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 185 (S.D.N.Y. 2010).

Additionally, while financial disclosures not prepared in conformance with GAAP are "presumed to be misleading" for purposes of Section 10(b) liability, "mere allegations of GAAP violations are insufficient to state a securities fraud claim." Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp., 951 F. Supp. 2d 479, 495 (S.D.N.Y. 2013) (citing Novak, 216 F.3d at 309). A plaintiff must therefore couple such allegations with evidence of "corresponding fraudulent intent" in order to state an actionable claim. Id. (citing Chill v. General Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996)). Moreover, the Second Circuit has instructed that "estimates of loan loss reserves are generally considered opinions, not objective facts," id., and a plaintiff must allege that the "opinions were both false and not honestly believed when they were made," Fait v. Regions Financial Corp., 655 F.3d 105, 113 (2d Cir. 2011); see City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp., 679 F.3d 64, 67-68 (2d Cir. 2012) (applying Fait to Section 10(b) claims).

### 2. Fraudulent Scheme Theory

To plead a fraudulent or deceptive scheme under Rule 10b-5(a) and (c), a plaintiff must allege that a defendant "(1) committed a deceptive or manipulative act, (2) with the requisite scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendant's actions caused the plaintiff's injuries." IBEW Local 90 Pension Fund v. Deutsche Bank AG, No. 11 Civ. 4209 (KBF), 2013 WL 1223844, at *11 (S.D.N.Y. Mar. 27, 2013). Because such a claim sounds in fraud, a plaintiff alleging scheme liability must set forth "specific facts regarding what manipulative acts were performed, which

defendant(s) performed them, when they were performed, and what the effect of the alleged scheme was on the securities." Id. (citing In re Global Crossing Ltd. Sec. Litig., 322 F. Supp. 2d 319, 329 (S.D.N.Y. 2004)). Notably, a defendant who did not actually make a material misstatement in connection with the alleged scheme may still be held liable under that theory. Id.

### 3. Scienter

Under either theory of liability, the PSLRA requires a plaintiff to "plead with particularity facts giving rise to a strong inference that the defendant acted with an intent to deceive, manipulate, or defraud or acted recklessly." Pa. Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp., 874 F. Supp. 2d 341, 357 (S.D.N.Y. 2012) (quoting ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009)) (internal quotation marks omitted) (emphasis in original). A securities fraud claim survives "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Oklahoma Firefighters, 951 F. Supp. 2d at 501 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323-24 (2007)). A court must consider "all of the facts alleged, taken collectively, . . . not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 323 (emphasis in original).

A plaintiff can plead a strong inference of scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). While "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this

12

inquiry," ECA, 553 F.3d at 198, a complaint may survive by alleging that the defendant "benefitted in some concrete and personal way from the purported fraud," Novak, 216 F.3d at 307-08. A defendant corporation or corporate officer is generally assumed to have the opportunity to commit fraud. In re MF Global Holdings Ltd. Secs. Litig., 982 F. Supp. 2d 277, 306 (S.D.N.Y. 2013) (collecting cases).

Alternatively, a plaintiff can plead scienter under the conscious misbehavior or recklessness prong, but "the strength of the circumstantial allegations must be correspondingly greater if there is no motive." ECA, 553 F.3d at 199 (internal quotation marks omitted). Under this theory, a complaint must allege conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Kalnit, 264 F.3d at 142 (quoting Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.), 220 F.3d 36, 39 (2d Cir. 2000)). The Second Circuit has identified at least four circumstances giving rise to a strong inference of scienter, including where a defendant is alleged to have:

> (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

ECA, 553 F.3d at 199 (quoting Novak, 216 F.3d at 311) (internal quotation marks omitted).

### 4. Loss Causation

A plaintiff must also allege loss causation to plead a claim under Section 10(b). "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted). To plead this element sufficiently, a plaintiff must provide "the defendants with notice of what the relevant economic loss might be [and] what the causal

13

connection might be between the loss and the [alleged] misrepresentation." Turner v. MagicJack VocalTec, Ltd., No. 13 Civ. 0448, 2014 WL 406917, at *12 (S.D.N.Y. Feb. 3, 2014) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005)). The Second Circuit has noted that "if the loss was caused by an intervening event . . . the chain of causation will not have been established[, b]ut such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003). Moreover, "[w]hile plaintiffs cannot simply plead an 'artificially inflated purchase price' to establish loss causation, allegations of significant price drops in response to disclosures of the alleged omissions or misstatements can establish loss causation." Police and Fire Ret. Sys. of City of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 228 (S.D.N.Y. 2009) (internal citation omitted).

### 5. Discussion

Defendants do not specifically contest the SCAC's sufficiency with regard to identifying speakers and alleged misstatements, or with regard to loss causation. Instead, Defendants chiefly argue that Plaintiffs have failed to plead a strong inference of scienter. (Defs. Mem. at 17-25).

As noted, a plaintiff can meet the pleading standard for this element by alleging motive and opportunity to commit fraud, or by alleging facts that show conscious misbehavior or recklessness. See Kalnit, 264 F.3d at 138. Even assuming the SCAC lacks facts evincing motive and opportunity, Plaintiffs have sufficiently alleged that Defendants engaged in behavior during the Class Period that was "highly unreasonable," if not "deliberately illegal." ECA, 553 F.3d at 199, 203. The SCAC alleges that Defendants sought to mask the increasing delinquency in SBI's loan portfolio – the core of its business – by commissioning fraudulent property appraisals, holding back corrective appraisals, recklessly understaffing the loan review office, and issuing falsely positive statements about SBI's financial health, risk management, and the robustness of

14

its loan review process. Drawing all reasonable inferences in Plaintiffs' favor, "[t]his is not 'just a GAAP violation' case." In re American Bank Note Holographics, Inc. Sec. Litig., 93 F. Supp. 2d 424, 447 (S.D.N.Y. 2000). Considering all of the facts collectively, the Court finds that the SCAC pleads a strong inference that Defendants engaged in conduct and/or made statements with "a mental state embracing intent to deceive, manipulate or defraud." Tellabs, 551 U.S. at 319. Accordingly, Defendants' motion is denied as to Count One.

## B. Section 20(a) Claim

To plead a claim of control person liability under Section 20(a), a plaintiff must plausibly allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108; see 15 U.S.C. § 78t(a).[4] Thus, "to withstand a motion to dismiss, a section 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness." Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221, 246 (S.D.N.Y. 2006).

Defendants appear not to challenge Individual Defendants' status as control persons, but instead argue that Plaintiffs have failed to plead either a primary violation or the culpable participation of Rock and Florek in the alleged fraud. (Defs. Mem. at 25). The Court has determined that Plaintiffs have adequately alleged a Section 10(b) claim. Moreover, "the pleading requirements for 'culpable participation' are satisfied by the same allegations that

---

[4] The Court notes that there is some dispute regarding the third element. See In re Parmalat Securities Litigation, 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007) ("[T]he Second Circuit recently listed culpable participation as an element of liability under Section 20(a)," but the statement in ATSI "was dictum" and "[w]hile the Court gives careful attention even to dicta of the Court of Appeals, it respectfully declines to follow these, which appear to be at odds with the language of Section 20(a)."). In any event, Plaintiffs successfully plead the element here and their claim does not turn on that question.

15

satisfy the scienter pleading requirements" for the primary violation. In re Am. Intern. Group, Inc. 2008 Sec. Litig., 741 F. Supp. 2d 511, 535 (S.D.N.Y. 2010). Defendants' motion therefore is denied as to Count Two.[5]

## IV.  CONCLUSION

For the reasons set forth above, Defendants' motion (Docket No. 54) to dismiss pursuant to Rule 12(b)(6) is DENIED and to strike pursuant Rule 12(f) is GRANTED in part and DENIED in part. In light of this determination, Plaintiffs' motion to lift the PSLRA discovery stay (Docket No. 47) is MOOT. The parties are directed to contact the chambers of Magistrate Judge Ramon E. Reyes, Jr., within two weeks of the date of this Order to schedule a conference.

**SO ORDERED.**

s/Sandra L. Townes
SANDRA L. TOWNES
United States District Judge

Dated: July 17, 2014
Brooklyn, New York

---

[5] "While a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage." In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d 382, 416 (S.D.N.Y. 2010).

16